IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　　　　　　　*Plaintiff,*<br><br>v.<br><br>15,478 SQUARE FEET OF LAND, MORE OR LESS, SITUATE IN THE CITY OF NORFOLK, COMMONWEALTH OF VIRGINIA, and BALAJI SAI, LLC., *et al.*,<br>　　　　　　　　　　　　　*Defendants.* | CASE NO. 2:10-cv-00322<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court upon Plaintiff's Rule 71.1(h) Motion to Exclude Defendant's Highest and Best Use (docket no. 66), Plaintiff's Rule 71.1(h) Motion to Exclude Defendant's Valuation Evidence on Costs of Defendant's Proposed Project (docket no. 67), and Defendant's Rule 71.1(h) Motion to Exclude Plaintiff's Highest and Best Use (docket no. 68). The motions have been fully briefed and were heard on June 13, 2011. A jury trial is set for July 13-15, 2011. After consideration of the parties' arguments, and for the reasons stated below, I will deny Plaintiff's motion to exclude Defendant's highest and best use, grant Plaintiff's motion to exclude valuation evidence on costs, and deny Defendant's motion to exclude Plaintiff's highest and best use.

I. BACKGROUND

The United States ("Plaintiff") initiated this federal condemnation proceeding on July 1, 2010, to acquire fee simple interest in 15,478 square feet, or 0.355 acres, of land located in Norfolk, Virginia ("the property"). The property is located in downtown Norfolk, Virginia, facing the streets

of Brambleton and York. The purpose of the condemnation action is to acquire land for the renovation and expansion of the Walter E. Hoffman United States Courthouse. The defendants claiming interest in the property are Balaji Sai, LLC ("Defendant" or "Balaji Sai"), which is the fee owner of the property, and the Bank of the Commonwealth, Balaji Sai's lender.

On July 1, 2010, which is the date of taking, the property was a vacant piece of land that had no physical improvements. Balaji Sai was planning to build a 15-story, 143-room, limited-service hotel on the property when it was taken. Balaji Sai purchased the property in May 2005 and hired an architect for the project in March 2007. After investigating the subject site and determining it was suitable for development of a Hampton Inn & Suites, Balaji Sai entered into a franchise agreement with Hilton Hotels Corporation ("Hilton") in April 2007 to develop the Hampton Inn & Suites Norfolk-Downtown on the property. The agreement states that "the rights and duties set forth in this Agreement are personal" to Balaji Sai, and that Hilton is entering into the agreement in reliance on the business skill, financial capacity, and personal character of Balaji Sai's members. Most forms of transfer or assignment of the franchise agreement require Hilton's consent, including approval of a complete application for a new franchise license agreement. In cases of actual or anticipated condemnation, the franchise agreement allows Balaji Sai to "transfer this Agreement to a nearby location" selected by Balaji Sai with Hilton's approval and within four months of the taking.

Once the franchise agreement was in place, Balaji Sai proceeded with its efforts to develop the Hampton Inn & Suites. Balaji Sai commissioned a geotechnical survey that concluded the site was suitable for hotel development. Balaji Sai then obtained a downtown development certificate to permit a hotel from the City of Norfolk in March 2008, received site plan approval from the Norfolk Department of Planning and Community Development in October 2008, received a downtown

certificate of appropriateness from the Norfolk Planning Commission in May 2009, and obtained approval of architectural and engineering plans by the Norfolk Design Review Committee and the Planning Commission. Balaji Sai was in the process of obtaining bids from construction companies to construct the hotel when the United States informed Balaji Sai of its intention to take the property. Balaji Sai had not secured financing for construction as of the date of value. Rajesh S. Randeria, who was designated to testify on behalf of Balaji Sai, testified that he did not know when it would be possible to obtain financing.

Defendant Balaji Sai's appraiser Heyward M. Cantrell valued the subject property at $3,060,000 as of the date of taking. Cantrell employed the sales comparison approach to determine the value of the land as $1,935,000. Cantrell used the cost approach to determine the value of other investments the landowner made in the property. These efforts were described as the work completed to demolish buildings extant on the property; to obtain various development, site, and construction permits; and to initiate planning of the Hampton Inn & Suites. Cantrell estimated that the costs contributed $727,583 in value to the property, which breaks down to $71,583 contributed by direct costs and $656,000 by indirect costs. Cantrell viewed costs for demolition of existing buildings, site work, architectural and engineering fees, other consulting fees, printing of site plans, real estate taxes capitalized, franchise fees, and interest and closing expenses on the loan to acquire the property as contributing value to the property. Cantrell then added $399,387 for entrepreneurial incentive, which was calculated as 15 percent of the sum of the land value and value contributed by costs. Cantrell's valuation was based on his opinion that the highest and best use of the property was development of a high-rise, upscale, limited-service hotel as of the date of taking.

Defendant's appraiser Richard W. White employed a similar approach in his valuation.

White valued the subject property at $2,825,000 as of the date of taking. White estimated the land value based on the sales comparison approach to be $1,700,000. White opined that development costs contributed $810,000 in value to the property: $70,000 contributed by direct costs, $439,550 by indirect costs, and $300,000 by financing costs.[1] White viewed costs for demolition, site work, architectural and engineering fees, accounting, other consulting fees, design review, real estate taxes capitalized, franchise fees, and interest and closing costs as contributing value to the property. White then added $315,000 for entrepreneurial incentive, which was calculated as 12.5 percent of the sum of the land value and the value contributed by costs. White's valuation was based on his opinion that the highest and best use of the property was development of a high-rise, upscale, limited-service hotel as of the date of taking.

Plaintiff's appraiser Michael Rountrey valued the subject property at approximately $1,400,000 for the land, which was calculated using the sales comparison approach. Rountrey did not increase his opinion of value based on costs or entrepreneurial incentive. Rountrey opined that the highest and best use of the property was to hold it for one to two years before developing it as a "mixed-use, multi-story building with retail, retail-related, or office use on the ground floor and residential or office use on the upper floors." Rountrey indicated at his deposition that his opinion of highest and best use includes the possibility of holding the property to develop it as a hotel. In the period before development, Rountrey opined that the property could be used for parking.

## II. APPLICABLE LAW

Under Federal Rule of Civil Procedure 71.1, "except for the single issue of just compensation, the trial judge in a condemnation case is to decide all issues, legal and factual, that

---

[1] Cantrell included financing costs in his measure of indirect costs.

may be presented." *United States v. Reynolds*, 397 U.S. 14, 19 (1970). Rule 71.1(h) "discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial." *Id.* at 19-20. "[T]he trial judge has the responsibility under [Rule 71.1(h)] to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." *United States v. 320.0 Acres of Land*, 605 F.2d 762, 815 (5th Cir. 1979); *see also United States v. Certain Land Situated in the City of Detroit*, 450 F.3d 205, 211 (6th Cir. 2006).

### III. PLAINTIFF'S RULE 71.1(H) MOTION TO EXCLUDE DEFENDANT'S VALUATION EVIDENCE ON COSTS OF DEFENDANT'S PROPOSED PROJECT (DOCKET NO. 67)

Plaintiff argues that it is improper to include value for costs and entrepreneurial incentive when the property is vacant and lacks any physical improvements, and moves to exclude such evidence from trial. Plaintiff contends that a buyer in the open market would not pay more for Defendant's pre-construction development activities, and that the value of the land as vacant already includes any value added by the development activities. According to Plaintiff, the proper way to determine the special suitability of a property for some future use is through comparison to properties in the same market that have or had similar adaptability at the time they were sold. Indeed, Defendant's appraisers did compare the parcel to sales prices of undeveloped land in the market area also slated for hotel development. With regard to entrepreneurial incentive, Plaintiff argues that entrepreneurial incentive should not be included in valuation of vacant land. It is Plaintiff's position that entrepreneurial incentive is tied to the cost approach and the cost approach should not be used to value the subject property because the property contains no structure or other physical improvements.

In response, Defendant argues that although construction of the Hampton Inn & Suites had

not been commenced as of the date of taking, substantial work had been completed towards development of the hotel, the property was "legally improved" to develop a hotel, and all development plans were in place prior to the taking. Although no physical development had occurred as of the date of taking—aside from demolition of existing buildings and associated site work—Defendant points out that site plans had been completed, a franchise agreement had been negotiated, and permits and approvals had been obtained. These intangible components of developing the hotel were "property" that was taken by the government, argues Defendant. In federal condemnation cases, the meaning of "property" is defined "by reference to local law." *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 289 (1943). Under Virginia Code § 25.1-100, "property" for the purposes of eminent domain is defined as "land and personal property, and any right, title, interest, estate or claim in or to such property." "Land" is further defined as "real estate and all rights and appurtenances thereto, together with the structures and other improvements thereon, and any right, title, interest, estate or claim in or to real estate." *Id.* Although Defendant cites Virginia's definition of property, it fails to explain how its various development costs meet that definition of "property." A willing buyer would not acquire, through purchase of the property, the site plans, the development permits, or any rights under the franchise agreement. Therefore, they are not part of the property taken by the government under federal or Virginia law, and should not be valued as such. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) (value compensable under Fifth Amendment "is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent"). In addition, it is well settled that frustration of contract is not compensable in a federal eminent domain case. *Omnia Commercial Co. v. United States*, 261 U.S. 502, 511-13 (1923).

Even if Defendant's pre-construction activities to develop the property are not considered property, Defendant asserts that it should be permitted to present evidence to the jury that those activities contribute value to the property over and above the property's land value, as calculated by comparison to sales prices of similar parcels. For example, Defendant argues that the fact that a premier hotel franchisor studied and approved the feasibility of the site for hotel development increases the value of the site to a potential purchaser. Although the franchise agreement was not acquired in the condemnation, Defendant argues that the possibility of a willing purchaser obtaining the agreement through assignment increases the value of the property. With respect to the permits and approvals granted by the City of Norfolk, Defendant contends that the City of Norfolk's stamp of approval on the property for development of the Hampton Inn & Suites increases its value in the eyes of a willing buyer aiming to develop it as a hotel. It is Defendant's position that the appraisers could not locate comparable sales of properties "which had been advanced to the legally-improved and partially developed state" that the subject property was in when it was condemned. (Def.'s Resp. to Pl.'s Mot. Exclude Costs 14.) Thus, it is argued that the value of the land derived from the sales comparison approach understates the property's actual value to a willing buyer.

No binding case has been identified by the parties in which a court allowed or excluded evidence of costs and entrepreneurial incentive to value a vacant property. The comparable sales method of valuation is the preferred approach for establishing the fair market value of property. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993); *United States v. 99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992); *United States v. 819.98 Acres of Land*, 78 F.3d 1468, 1471 (10th Cir. 1996). In general, under condemnation law, the condemnor "must pay only for what it takes, not for the opportunities the owner may lose." *Powelson*, 319 U.S. at 281-82. "There are

numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment." *Id.* "While the rule may appear unjust, it is well settled that the landowner is not entitled, at least within the framework of a condemnation suit, to be compensated for such consequential damages as loss of business, relocation expenses, and the like." *United States v. 38.60 Acres of Land*, 625 F.2d 196, 200 (8th Cir. 1980) (finding that "the mere frustration of [] an improvement project is not compensable"). In *United States v. 1735 North Lynn Street*, 676 F. Supp. 693, 701 (E.D. Va. 1987), the court ruled that it would be impermissible to award consequential damages or damages for frustration of renovation plans where the government had temporarily occupied a building, disrupting the owner's plans for renovation of the building.

There is no basis for using the cost approach to value the appropriation here. The cost approach to performing an appraisal is defined as follows:

> A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) *the existing structure*, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised.

*The Dictionary of Real Estate Appraisal* 47 (5th ed. 2010) (emphasis added); *see also The Appraisal of Real Estate* 388 (13th ed. 2008). The cost approach requires that land and improvements must be valued separately. *The Appraisal of Real Estate, supra*, at 383. It is employed to value an "existing structure" on the property by calculating the cost to construct a replacement for the structure. A "structure" is "[a]n edifice or building; an improvement." *The Dictionary of Real Estate Appraisal, supra*, at 188. "Improvements" are defined as "[b]uildings or other relatively permanent structures or developments located on, or attached to, land." *Id.* at 98. "Development" is defined as the

"transformation of formerly raw land into improved property through the application of labor, capital, and entrepreneurship." *Id.* at 57.

In short, the cost approach is designed to value properties with physical improvements. The subject property in the present matter was vacant. Although I take no position as to the appropriateness of the cost approach methodology in other circumstances, use of the cost approach here is unwarranted because the sales comparison approach is adequate to capture the value inherent in the property's potential for development as a hotel. In summarizing his specific application of the comparable sales approach, Defendant's appraiser Cantrell stated that he "investigated land sales located in the downtown market with similar zoning and development potential that have occurred over the past few years." Cantrell "found these sales to be a good representation of market transactions in the area. We estimate that the subject property would fall within the range of the adjusted unit prices. The subject property is being appraised as-is, considering its highest and best use, and acknowledging the steps the property owner has completed to entitle the property since its purchase in May 2005." Defendant's appraiser White similarly described his utilization of the sales comparison approach, stating "[t]his approach compares sales of parcels like the subject that have been, are being, or can be developed in a manner similar to that projected for the subject." White focused his research "on vacant parcels which were subsequently developed with lodging facilities." Because White only located one sale that occurred in downtown Norfolk that was proposed to be developed as a hotel, he expanded his geographical range and based his land value estimate on "three (3) vacant land sales which were developed with either limited service or select service hotels and one land sale which is currently under contract." Thus, it is not the case here that no comparable sales could be located, forcing resort to another method of valuation. *See United States v. 121.20*

*Acres of Land*, 333 F. Supp. 21, 28 (E.D.N.C. 1971) (allowing the cost approach "because of the lack of comparable sales to support the normally most reliable market data approach").

Moreover, value contributed by several of the costs Defendant's appraisers took into account was already captured by analysis of comparable sales, and therefore allowing evidence of value above the land value risks "double counting" that value. Efforts and expenditures made by the landowner to bring the property to its present, vacant state, and to maintain it as such, are reflected in the comparison of the parcel to the prices paid on the market for other vacant parcels. Costs to demolish buildings extant on the property and the associated site work, and property maintenance costs such as real estate taxes capitalized, do not inure to the benefit of a prospective buyer over and above any increase in value from the property's status as vacant land. Other costs, such as printing of site plans—for site plans that were not acquired in the taking—and interest and closing expenses on the landowner's loan to acquire the property, do not appear to have any connection to a willing buyer's estimate of the price he would pay for the property. The contribution by these costs to the property's value is speculative. To the extent the inclusion of such costs in the valuation is an attempt to collect reimbursement for Defendant's prior investment in the property, the costs are impermissible, as the Fifth Amendment does not guarantee the landowner a return on his investment. *Powelson*, 319 U.S. at 285.

All evidence of entrepreneurial incentive or profit will also be excluded. Entrepreneurial incentive is defined as "the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project." *The Appraisal of Real Estate, supra*, at 388. Entrepreneurial incentive is a recognized element of the cost approach methodology. Because the cost approach is improper in the

determination of just compensation for this property, entrepreneurial incentive is inapplicable.

## IV. PLAINTIFF'S RULE 71.1(H) MOTION TO EXCLUDE DEFENDANT'S HIGHEST AND BEST USE (DOCKET NO. 66)

Just compensation is not "the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.'" *United States v. Petty Motor Co.*, 327 U.S. 372, 377 (1946). Fair market value is determined by considering the property's "highest and best use," which is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S. 246, 257 (1934). Without contrary proof, "the highest and best use of a property is presumed to be its current use." *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991). If a landowner "posits that a different use is 'highest and best,' he must show that this use is 'reasonably probable' and that the probability has a real market value." *Id.* In order for a landowner to claim just compensation based on a proposed use, there must be evidence that the use is reasonably probable within the reasonably near future – and hence, not a speculative use. *See Olson*, 292 U.S. at 255-57. The appraiser must determine the highest and best use of the property by analyzing four criteria: whether the use is (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) maximally productive. *The Appraisal of Real Estate, supra*, at 278-79. In this matter, Defendant has the burden to show that its proposed highest and best use is reasonably probable.

Plaintiff argues there are two general problems with the highest and best use analysis conducted by Cantrell and White: (1) the appraisers improperly relied on the use to which Defendant hoped to put the property, rather than on the uses dictated by the market; and (2) there was insufficient market demand for construction of a hotel on the date of taking. First, Plaintiff claims that Cantrell and White both determined the highest and best use based on Defendant's

planned 143-room premier, limited-use hotel. Plaintiff states that Cantrell arrived at his highest and best use by determining the residual property value of an operating hotel using Defendant's own projected income, expenses, and costs for the planned Hampton Inn & Suites. Cantrell compared that residual value, $3,785,000, to his valuation of the property, $3,060,000, and concluded that because the residual value was greater than the property's value, it was financially feasible to construct the hotel. Plaintiff states that White arrived at his highest and best use by developing a stabilized income and expense model for the proposed 143-room hotel planned by Defendant as if it were complete. White then compared the resulting value of the proposed hotel, as if finished, with the estimated costs to construct the improvements.

Understandably, use of Balaji Sai's actual income, expense, and cost projections may raise concerns that the data was biased or particular to Balaji Sai's project. But the appraisers claim to have verified Defendant's projections with objective market data and found them to be consistent. This is sufficient to allow presentation of their opinions at trial. Cantrell compared Defendant's figures with market forecasts provided by STR Analytics, a subsidiary of Smith Travel Research, and PKF Hospitality Research, two companies that assemble and distribute lodging statistics nationwide. He also utilized the analysis and expertise of David Mumford of Mumford and Company, a hotel broker familiar with the downtown Norfolk lodging market, to verify the projections. Cantrell found that the difference between revenue predicted by the market data and revenue forecasted by Defendant was explained by a premium that is placed on top brand hotels. He found that the expenses projected by Defendant were consistent with the range of expenses provided by the market data. White employed the construction cost estimates of Defendant's planned hotel, but largely relied on the STR Analytics and PKF Hospitality Research data to figure future revenues

and operating expenses.[2]

The second objection Plaintiff has to admission of Defendant's proposed highest and best use is that there was insufficient market demand for construction of a hotel on the date of taking, and therefore Defendant's highest and best use is not financially feasible. Primarily, Plaintiff argues that Defendant's appraisers assumed occupancy rates, average daily rates, and revenue per available room that were well above the market data they identified based solely on the proposition that a premium brand hotel achieves better performance. According to Plaintiff, this was unjustified because the performance of the Marriott Residence Inn, a top brand hotel located in downtown Norfolk, did not match the performance Defendant's appraisers expected of a premium brand hotel.

Defendant asserts that its appraisers' opinions were adequately supported by objective market data, which showed that financing was improving and the outlook for hotel development in the Norfolk market was positive. In White's financial feasibility analysis, he stated, based on STR Analytics data, that occupancy rates in the greater Norfolk market for the twelve months ending June 2010 were slightly less than 62 percent, which was almost five percent points above the national average. White estimated that the downtown Norfolk properties had even higher occupancy rates during this time period. White then used STR Analytics projections of occupancy rates and average daily rates for downtown Norfolk properties from 2011 to 2015, combined with the most recent PKF Hospitality Research data, to arrive at a projected occupancy and average daily rate for the subject property. The market projections used by White showed increasing occupancy and average daily rates over this time period. White's final projected rates were altered to reflect that "an upper tier,

---

[2] Plaintiff's specific concerns (*i.e.*, sufficiency of parking, transferability of franchise rights, and adaptability of architectural plans) about using Balaji Sai's revenue, expense, and cost projections miss the mark. It is permissible to argue at trial that the projected revenue, expenses, and costs for Defendant's Hampton Inn & Suites approximate those for a similar premier, limited-service hotel.

limited-service Hotel will naturally garner a premium because of size, location, and overall recognition within the market. It has been our personal experience through discussions with major franchises such as Hilton, Holiday Inn, and Marriott that reservation contributions typically range from 38.0% to 50.0% of their total occupancy." He then used these rates to prepare the income and expense analysis to assess the financial feasibility of a limited-service hotel.

Similarly, Cantrell purported to ground his financial feasibility analysis in objective market data. He relied heavily on the STR Analytics data and projections of the greater Norfolk market and the PKF Hospitality Research data regarding limited-service hotels in the South Atlantic region. His comparison of 2009 statistics lead him to express the opinion that hotel performance in the downtown Norfolk market area far exceeded that of limited-service hotels in the South Atlantic region, suggesting that Norfolk was a premium location for limited-service hotel development. Cantrell also cited national market statistics that showed the overall hotel market rebounding, with particular growth in business-oriented hotels and upscale hotels, and with demand far outstripping supply. The national data relied upon by Cantrell also showed improvement in the availability of hotel financing. Ultimately, Cantrell's projections to assess the financial feasibility of hotel development on the subject property were based on a premium factor of 16 percent above the STR Analytics revenue projections for 2012-2015. He felt this premium was warranted based on consultation with David Mumford of Mumford and Company, who estimated, based on his experience, that premium branded hotels typically achieve a 15 percent to 25 percent premium over their competitors.

Regardless of whether I agree with Defendant's experts that a top-brand, limited-service hotel merits a substantial premium over its competitors in the downtown Norfolk market, their

conclusions are sufficiently grounded in market evidence to support their opinions of highest and best use. Issues related to the reliability of the data and projections can be addressed at trial with regard to the weight of the evidence, rather than its admissibility. *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

Plaintiff presents additional contentions that there was insufficient market demand for construction of a hotel on the date of taking. Plaintiff asserts that Defendant's appraisers ignored the fact that Defendant had not secured financing for construction five years after purchasing the property for hotel development. Defendant counters that it planned on seeking construction financing after securing a final bid from a construction contractor, and that postponing the application for financing does not show that financing could not be obtained on the date of taking. Plaintiff argues that Defendant's appraisers underestimated the importance of the following evidence of weak market demand: the proposed 301-room Westin Hotel complex was put on hold indefinitely; the proposed 150-room Hilton Garden Inn was put on hold; and the proposed 125-room extended-stay hotel at Fort Norfolk Plaza was not developed, though the medical office building that was part of the same project was developed. Defendant responds that Marriott recently completed an extended-stay hotel in the market area, that the Westin Hotel complex was a dissimilar project involving condominiums and a conference center, that the Hilton Garden Inn was temporarily on hold but was not canceled, and that the Fort Norfolk Plaza hotel was not in downtown Norfolk. The fact that several planned hotels were not built could be viewed as buttressing Defendant's position that the supply of hotel rooms was not oversaturated. Plaintiff asserts that Defendant's appraisers

failed to consider the impact that the addition of the proposed 143-room hotel would have on occupancy rates. Defendant replies that the occupancy rates its appraisers employed reflected consideration of future hotel development. Although these arguments demonstrate that Plaintiff has grounds to attack Defendant's evidence at trial, Plaintiff's arguments do not convince me that Defendant's asserted highest and best use is not reasonably probable.

Finally, Plaintiff takes the position that Defendant's experts cannot defend the capitalization rates they selected to convert the projected stream of future income for a hotel into a residual present value, which they compared to the estimated cost to complete a hotel to assess its financial feasibility. The evidence is that overall capitalization rates in the hospitality industry fell in the range of 8 percent to 12 percent, with an average rate of 10.2 percent. White adopted a capitalization rate of 8 percent in year two and 8.5 percent in year three, and Cantrell adopted a rate of 8 percent. Defendant's appraisers used capitalization rates below the industry average because they believed the subject property was located in a desirable urban market in which hotels historically performed well, and the hotel was new construction. The capitalization rates used by the appraisers are within the industry range, albeit on the low end. This particular dispute is more appropriately presented to the jury.

In sum, I conclude, based on the arguments and the evidence before me, that Defendant has met its burden at this stage of the litigation of showing that its proposed highest and best use is financially feasible, such that it can be presented at trial.

## V. DEFENDANT'S RULE 71.1(H) MOTION TO EXCLUDE PLAINTIFF'S HIGHEST AND BEST USE (DOCKET NO. 68)

Defendant also moves to exclude the proposed highest and best use of Plaintiff's appraiser Rountrey, which is to hold the property for one to two years before developing it as a mixed-use

building. Preliminarily, the parties disagree over whether Rountrey opined that the highest and best use of the subject property includes the possibility of future development of a hotel. Although his report is ambiguous on this point, he testified at deposition that hotel development was encompassed within his opinion on highest and best use, and I will treat his opinion in that way. Defendant claims that the objective market evidence clearly shows that construction of a hotel could commence on the date of taking and would not require a one to two year holding period. Defendant asserts that Rountrey supplied little to no evidentiary support for his conclusion that hotel development could not commence on the date of taking.

The law presumes that the highest and best use of the property is its use at the time of taking. When condemned, the property was vacant. Balaji Sai's testimony is that the property was in the process of being developed as a hotel, and that construction could have commenced eight to twelve months from the date of taking. Therefore, on the evidence presently before me, the use of the property at the time of taking, and its presumed highest and best use, was holding the property until pre-construction development activities could be completed and construction could be commenced. The difference between the property's current use and Plaintiff's proposed highest and best use is essentially that Plaintiff asserts the property should have been held until market trends revealed the most profitable use of the property, rather than until the completion of pre-construction development tasks. That Plaintiff's proposed use is so similar to the way the property was actually being used on the date of taking weighs against excluding Plaintiff's opinion outright. Further, Rountrey's opinion is sufficiently supported by market evidence showing that its proposed use is reasonably probable that it should be permitted to be presented to the jury. Rountrey opined that although the downtown Norfolk lodging market traditionally has been strong, "this history will be tested with the completion

of the Marriott Residence Inn." Rountrey was concerned with the possibility that many of the hotel projects planned for the Norfolk area that were currently on hold would move forward and saturate the market with hotel rooms. Rountrey observed that "the hotel industry was hard hit by the recession," and was not expected to "turn around" until 2011, "possibly delayed until 2012 given the weak recovery to date." Importantly, Rountrey opined that financing was "noticeably difficult to obtain at the current time for hotels." Evidently, Rountrey's assumptions about the timing of the market's recovery, the availability of financing, and the supply of hotel rooms persuaded him that development of a hotel on the subject property was not financially feasible on July 1, 2010, but might be feasible as soon as July 2011. In practice, Rountrey's opinion on highest and best use is not far apart from that of Defendant's appraisers. I hold that each party will be permitted to put on its opinions of highest and best use at trial.

## VI. CONCLUSION

For the reasons stated above, the following will be ordered:

- Plaintiff's Rule 71.1(h) Motion to Exclude Defendant's Valuation Evidence on Costs of Defendant's Proposed Project (docket no. 67) will be GRANTED. Defendant will not be permitted to present any evidence of value contributed by costs or entrepreneurial incentive. Defendant is still permitted to present its opinions of the fair market value of the property based on the comparable sales valuation methodology;

- Plaintiff's Rule 71.1(h) Motion to Exclude Defendant's Highest and Best Use (docket no. 66) will be DENIED; and

- Defendant's Rule 71.1(h) Motion to Exclude Plaintiff's Highest and Best Use (docket no. 68) will be DENIED.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this __20th__ day of June, 2011.

*Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE